Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Lisa M. Cintron (SBN 356009)
lcintron@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310-474-9111
Facsimile: 310-474-8585

Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: 917.336.0171
Facsimile: 917.336.0177

*Counsel for Plaintiffs and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THOMAS THELE, MELO PORTER, and EDWARD GOLDSTEIN, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 5:25-cv-09704-NC<br><br>Hon. Noël Wise<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Thomas Thele, Melo Porter, and Edward Goldstein (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated ("Class Members"), by and through their undersigned counsel, bring this class action complaint against Defendant Google LLC ("Google").

## I. <u>INTRODUCTION</u>

1. Much like its competitors, Google has developed and deployed an artificial intelligence program named Gemini throughout its portfolio of services. Some of Google's most popular services include Gmail, Chat, and Meet, which millions of Americans use every day to email, instant message, and videoconference, respectively. Until recently, Google users could "opt in" and turn on Gemini as a "Smart" feature for these services, purportedly to "personalize [their] experience":



2. However, in or around the fall of 2025, users and data privacy professionals began noticing unsolicited changes within their Google accounts: Google secretly turned on Gemini for all its users of Gmail, Chat, and Meet accounts, enabling AI to track users' private communications in those platforms without the users' knowledge or consent. Given the surreptitious nature of Google's actions, Plaintiffs are unable to allege with greater specificity the precise timing of the changes and the procedures Google used. This information is solely within Google's knowledge and control and, therefore, can only be clarified through discovery. As of the date of this filing, Google continues to track these private communications with Gemini *by default*, requiring users to affirmatively find this data privacy setting and shut it off in at least two separate locations, despite never agreeing to such AI tracking in the first place.

3. Even though users never gave Google informed consent to track and store their private communications, Google does just that, using Gemini AI to access and exploit the entire recorded history of its users' private communications, including literally every email and attachment sent and received in their Gmail accounts.

4. Google's deceptive and outrageous conduct violates its users' reasonable expectations of privacy. The intent and efforts of individuals to safeguard their private information and communications must be respected. The ramifications of unauthorized access to voluminous private communications can be severe, and individuals accordingly go to great lengths to safeguard not only their own email and messaging accounts, but, in the case of parents and guardians, also that of their minor children.

5. While falsely characterizing its illusory privacy controls, Google deceptively and unconscionably deprived and continues to deprive Plaintiffs and Class Members of their privacy right to send and receive private communications via email, chat, and video. This is true not only for Plaintiffs and Class Members, but also for their children (as applicable), whose private communications they also sought to protect.

6. Google's conduct violates the California Invasion of Privacy Act (Cal. Penal Code §§ 630 *et seq.* ("CIPA")), the California Computer Data Access and Fraud Act (Cal. Penal Code § 502 ("CDAFA")), the Stored Communications Act (18 U.S.C. §§ 2701 *et seq.* ("SCA")), the

California Unfair Competition Law (Cal. Bus. & Prof. Code §§ 17200 *et seq.* ("UCL")), and California's Constitutional Right to Privacy, and it constitutes an unlawful intrusion upon seclusion.

## II. THE PARTIES

### A. Plaintiff Thomas Thele

7. Plaintiff Thomas Thele resides in Cook County, Illinois. He is not comfortable using AI technology, has always been concerned about the privacy of his Google account, and would never have opted into the use of Gemini AI in his Gmail.

8. Plaintiff Thele first registered for a Google account, including Gmail, in approximately 1999. Plaintiff Thele did not receive any notice that "Smart features" were enabled on his Google account at the time it was created, nor does he recall ever opting in or enabling those features at a later date. Since its creation, Plaintiff Thele has maintained and used, and continues to maintain and use, his Google account, including the Gmail, Chat, and/or Meet services.

9. Plaintiff Thele values his privacy—and the privacy of his family and friends—in the use of these password-protected services and reasonably expected the messages and conversations therein to remain private.

10. Despite this reasonable expectation, Google surreptitiously turned on the "Smart features" setting in Plaintiff Thele's data privacy settings without his knowledge or consent and began tracking Plaintiff Thele's private communications with Gemini AI. Throughout the relevant time period, Plaintiff Thele regularly used his account throughout the day, unaware that Google's Gemini AI was monitoring and tracking those private messages and conversations.

11. Within approximately the last year, Plaintiff Thele noticed that there were Gemini features enabled on his Gmail account. For instance, when running a keyword search in his Gmail, Plaintiff Thele noticed that he would receive "Did you mean…?" suggestions for his search that did not match the keywords he had used and appeared to be AI-generated. Plaintiff Thele has private family communications and communications related to his financial investments that he believes were viewed by this AI technology without his consent. He has never seen where in his settings Gemini AI or "Smart features" were enabled on his account, and he is unaware how those "features"

were enabled because he has never changed any settings in his Google account. Plaintiff Thele is concerned that the personal information that Google accessed will be used indefinitely for purposes for which he has not consented, including training Google's AI.

**B. Plaintiff Melo Porter**

12. Plaintiff Melo Porter resides in Santa Cruz County, California. She has always been concerned about the privacy of her Google account, and would never have opted into the use of Gemini AI in her Gmail.

13. Plaintiff Porter has two Google accounts: the first she opened in approximately 2008 and the second in approximately 2023. Plaintiff Porter did not receive any notice that "Smart features" were enabled on her Google accounts at the time they were created, nor does she recall ever opting in or enabling those features at a later date. Since their creation, Plaintiff Porter has maintained and used, and continues to maintain and use, her Google accounts, including the Gmail, Chat, and/or Meet services.

14. Plaintiff Porter values her privacy—and the privacy of her family and friends—in the use of these password-protected services and reasonably expected the messages and conversations therein to remain private.

15. Despite this reasonable expectation, Google surreptitiously turned on the "Smart features" setting in Plaintiff Porter's data privacy settings without her knowledge or consent and began tracking Plaintiff Porter's private communications with Gemini AI. Throughout the relevant time period, Plaintiff Porter regularly used her accounts throughout the day, unaware that Google's Gemini AI was monitoring and tracking those private messages and conversations. Her Gmail contains communications that include confidential financial and medical information that she does not want to be accessed by AI technology.

16. In or around the fall of 2025, Plaintiff Porter learned that there were Gemini features enabled on her Gmail account and subsequently noticed that AI features were enabled. Within the same time period, Plaintiff Porter recalls reading an Instagram article about the use of AI in Gmail accounts. After seeing the article, she went into her Google account settings and saw that "Smart features" was turned on, despite her never enabling those features herself.

17. Plaintiff Porter thus believes that Google had been using AI to review private information in her Gmail account. Although she attempted to turn off the "Smart features" on her Google accounts, Plaintiff Porter is not sure whether those "features" truly have been disabled and is concerned that Google can and will turn them back on at any time. She is also concerned that the information accessed, viewed, and analyzed by Google's AI remains in Google's control, is connected to her user profile, and may be used to train Google's AI.

**C. Plaintiff Edward Goldstein**

18. Plaintiff Edward Goldstein resides in Snohomish County, Washington. He has been employed in data security for years, is concerned about the privacy of his Google account, and would never have opted into the use of Gemini AI in his Gmail.

19. Plaintiff Goldstein has three Google accounts. He opened his first account in approximately 2006 and a second in approximately 2010 (collectively, "Gmail Accounts"). Plaintiff Goldstein regularly used his Gmail Accounts throughout the relevant time period. In 2014, Plaintiff Goldstein opened a third account that he stopped using regularly in 2015 ("Inactive Account"). Plaintiff Goldstein did not receive any notice that "Smart features" were enabled on his Google Accounts at the time they were created, nor does he recall ever opting in or enabling those features at a later date. Plaintiff Goldstein has maintained and used, and continues to maintain and use, his Google Accounts, including the Gmail, Chat, and/or Meet services.

20. Plaintiff Goldstein values his privacy—and the privacy of his family and friends—in the use of these password-protected services and reasonably expected the messages and conversations therein to remain private.

21. Despite this reasonable expectation, Google surreptitiously turned on the "Smart features" setting in Plaintiff Goldstein's data privacy settings without his knowledge or consent and began tracking Plaintiff Goldstein's private communications with Gemini AI. Throughout the relevant time period, Plaintiff Goldstein regularly used his Gmail Accounts throughout the day, unaware that Google's Gemini AI was monitoring and tracking those private messages and conversations.

22. Plaintiff Goldstein values his privacy and uses two-factor authentication to protect

the privacy of his Gmail Accounts. Plaintiff Goldstein communicates PII through his email in connection with, for example, his lease and car payments. Plaintiff Goldstein also receives communications from his pharmacy and purchases on Amazon. He also sends and receives private and personal communications amongst his friends. Given his employment in data security and the highly confidential information conveyed in his Gmail account, Plaintiff Goldstein would not have agreed to opt into the use of Gemini AI.

23. In approximately November 2025, Plaintiff Goldstein saw posts on LinkedIn and Threads from data security professionals indicating that Google may have turned on the Smart features in his Gmail Accounts without his knowledge:







24. From his mobile device, Plaintiff Goldstein immediately checked whether the Smart features were enabled in his Google Accounts. Despite never opting into the Smart features or consenting to the use of Gemini AI in his Gmail Accounts, the Smart features on Plaintiff Goldstein's Gmail Accounts were enabled. Plaintiff Goldstein took the following screenshot and immediately disabled the Smart features in his Gmail Accounts:



25. Plaintiff Goldstein then navigated to his Inactive Account, which he had not used in at least two years. As a result of this dormancy, Google required Plaintiff Goldstein to conduct an account recovery in order to reactivate this account. Upon reactivation, Plaintiff Goldstein was not asked to consent to or opt into the Smart features, nor did he receive any notification, pop-up, banner, email, or alert regarding the use of Gemini AI or the automatically enabled Smart features. Nevertheless, Plaintiff Goldstein navigated to the settings and discovered that here too the Smart features were enabled even though he had not accessed the account in at least two years and had not changed any of the settings. Plaintiff Goldstein never opted into or consented to the Smart features, yet the Smart features were enabled:




26. Plaintiff Goldstein was so frustrated and alarmed by Google's intrusion that he immediately filed a complaint with the Federal Trade Commission, requesting an investigation and "written confirmation from Google that my prior privacy settings will be honored and not silently overridden."

27. Although he attempted to turn off the "Smart features" on his Google accounts, Plaintiff Goldstein is not sure whether those "features" truly have been disabled and is concerned that Google can and will turn them back on at any time. He is also concerned that the personal information that Google accessed while the Smart features were enabled remains in Google's control and will be used indefinitely for purposes for which he has not consented, including training Google's AI.

**D. Defendant**

28. Defendant Google LLC is a limited liability company headquartered in Mountain View, California, and formed under the laws of Delaware. Google is a sophisticated mobile

operating system, email, and applications developer in the business of commercializing personal data extracted from the use of tools and services connected to the internet. As such, Google is aware of and benefits from the conduct described herein. Indeed, this forms a core component, among others, of Google's business model.

## III. JURISDICTION AND VENUE

29. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1367 because this is a class action in which the matter or controversy exceeds the sum of $5,000,000, exclusive of interest and costs, and in which some Members of the proposed Class are citizens of a state different from Google.

30. This Court has personal jurisdiction over Google because Google owns and operates a business that is headquartered in this District and conducts substantial business throughout California. Google expressly consents to the jurisdiction of the federal or state courts of Santa Clara County, California through its terms of service.[1]

31. Venue properly lies in this District pursuant to 28 U.S.C. § 1391(b)(1), as Google is headquartered in this District.

## IV. CHOICE OF LAW

32. California law governs the substantive legal issues in this case. Google's Terms of Service provide in pertinent part that California law will apply to any disputes arising out of or relating to Google's terms of service.[2]

## V. STATEMENT OF FACTS

### A. Millions of Americans Use Google Accounts for Private Communications.

33. According to recent reporting, an estimated 1.8 billion people globally in 2025 have active Gmail accounts.[3] It is estimated that 41.9% of United States citizens use Gmail, which

---

[1] Google Terms of Service (last modified May 22, 2024), *available at* https://policies.google.com/terms?hl=en.

[2] *Id.*

[3] Robert A. Lee, *Gmail Statistics 2025: User Growth, Market Share & Emerging Trends*, SQ Magazine, Aug. 6, 2025, *available at* https://sqmagazine.co.uk/gmail-statistics/.

amounts to over 130 million American users.[4]

34. In Google's Gmail, Chat, and Meet services, users reasonably expect to customize their use of these services to their preferences by managing various functionalities and settings. They can, for example, change their preferred language, time zone, or storage settings. Included among these functionalities, within "Data privacy," is the option to turn on or off Google's use of "Smart features"—that is, Google's ability to track the user's "email, chat, and video content" with its Gemini AI technology. In its terms of service, Google's only reference to AI is in the context of "develop[ing], improv[ing], and updat[ing]" its services:

> We're constantly developing new technologies and features to improve our services. For example, we use artificial intelligence and machine learning to provide you with simultaneous translations, and to better detect and block spam and malware. As part of this continual improvement, we sometimes add or remove features and functionalities, increase or decrease limits to our services, and start offering new services or stop offering old ones.[5]

In its privacy policy, Google states that "across our services, you can adjust your privacy settings to control whether we collect some types of data and how we use it."[6]

**B. Google Surreptitiously Enabled Gemini AI.**

35. On information and belief, Google turned on this "Smart features" option—without any notice to users—for all Gmail, Chat, and Meet accounts in or around the fall of 2025, which enabled Gemini AI to scan, read, and analyze every email (and email attachment), message, and conversation on those services. Users are only learning of this AI feature through news reports or their own alarming experiences, including where Gemini AI summarized the contents of an email attachment with identifying information and deeply personal content or where Gemini AI referenced the contents of their emails in a Google search result summary. The intentionally surreptitious nature of Google's actions precludes Plaintiffs from alleging with any more specificity the timing and procedures through which Google unilaterally enabled AI features in users'

---

[4] *Id.*; *see also* Dominic Reigns, *35+ Gmail Statistics And User Trends [2025 Updated]*, About Chromebooks, Aug. 7, 2025, *available at* https://www.aboutchromebooks.com/gmail-statistics/.

[5] *Supra* n.1.

[6] Google Privacy Policy (last modified July 1, 2025), *available at* https://policies.google.com/privacy?hl=en-US.

accounts. On information and belief, Google users began noticing these features were enabled in their accounts in November 2025 without having enabled them. This knowledge is not uniform though. To date, there are still many users that have not yet discovered, or only recently discovered, that Google enabled the Smart features option in their account without their knowledge.

36. Google users now must recognize the unconsented use of AI in their accounts and then proactively go into their account settings and locate and turn off this feature—in at least two separate locations—to prevent Gemini AI from tracking their Gmail, Chat, or Meet communications. Despite this setting being in default, "opt out" status since at least the fall of 2025, the setting is still worded as an "opt in" feature: "*When you turn this setting on, you agree* . . ." (emphasis added). Google's secretive Gmail, Chat, and Meet tracking practices are not only deceptive and unethical, they are directly contrary to users' reasonable expectations of privacy.

37. It appears that even tech journalists monitoring Google's use of Gemini AI in Gmail are not fully aware of this change. Recent articles about using Gemini in Google services like Gmail still characterize the feature as something that must be agreed to and affirmatively turned on.[7] Nonetheless, this reporting confirms that, when active, Gemini is "downright creepy" in its ability to track, analyze, and immediately know private information:

> In testing [Gemini in Gmail], it was able to tell me useful information, such as when my next Trade coffee delivery would arrive and if I had any pressing emails that required responses. But it goes far beyond that.
>
> When I asked it about my first crush, Gemini was able to determine that it occurred in elementary school, as well as tell me the name of my first love, how we met, and when. Upon request, Gemini also told me who my top Facebook friends were in 2009 and who my best friend was in 2010. Gemini even explained that one of my character flaws is that I get "too laser-focused on what [I] want, which extracts a toll on [my] relationships, much like Drake from the Uncharted game." And, yes, that's one of my favorite game franchises, which apparently Gemini knows, too.
>
> How does Gemini know that? The simple answer is that the information is somewhere within the 16 years' worth of my email history that it can access.
>
> . . . .

[7] Ruben Circelli, *I Let Gemini Access My Gmail, and It's Downright Creepy*, PC MAG, Nov. 5, 2025, *available at* https://www.pcmag.com/opinions/i-let-gemini-access-my-gmail-and-its-downright-creepy.

> I don't plan on letting Gemini access my personal email anymore.[8]

### C. Plaintiffs and Class Members Were Harmed.

38. On information and belief, Google uses the data it collects from users' private emails and attachments in order to train its AI models. While Google indicates that user data is not used to train Google's base AI models, Google makes no assurance as to training for its higher-tier AI models. Users report that the contents of their emails and attachments has been scanned and summarized by Gemini AI and inferences based upon the same have appeared in Gemini AI-generated Google search results. Further, Google has generally confirmed that it uses human reviewers and labelers to assess data scanned and reviewed by its AI models. It follows then that any emails and attachments scanned by Gemini AI may be subject to human review.

39. Google is now able to collect and utilize users' private communications through AI "Smart features" and combine it with existing data profiles it has for its users. Back in 2012, Google announced that it would eliminate distinctions between data collected from different Google products and services for purposes of its advertising, data analysis, and other activities, saying specifically that Google "may combine information you've provided from one service with information from other services," and "[w]e'll treat you as a single user across all our products."[9]

40. Through the use of its Gemini AI technology, Google has created the means to illicitly compile all of its users' private communications on its platforms without those users' express knowledge and consent. The data from these communications enables Google to cross-reference and conduct unlimited analysis toward unmerited, improper, and monetizable insights into users' private lives, including their social, professional, and other relationships.

41. The collection and use of users' private communications violates users' reasonable expectations of privacy, and also puts them at increased risk for further privacy violations. Data breaches and other security vulnerabilities are increasingly common among companies that store

---

[8] *Id.*

[9] Alma Whitten, *Updating our privacy policies and terms of service*, GOOGLE OFFICIAL BLOG (Jan. 24, 2012), *available at* https://googleblog.blogspot.com/2012/01/updating-our-privacy-policies-and-terms.html.

user data. As a major aggregator of valuable personally identifying and other information, Google is an obvious target for hackers. Any information that Google stores through its Gemini AI platform may eventually be stolen, if it has not already been. In 2018, for example, Google announced that it had discovered a vulnerability in its Google+ program that exposed personal account information to third-parties, contrary to its user agreements and representations. Reportedly, in order to protect its public image, Google failed to disclose that information to the public for months, and came clean only *after* the security risk was discovered by the media.[10]

42. Each of the following acts defy social norms and invade reasonable privacy expectations: tracking private communications contrary to users' consent, misleading users regarding whether the AI tracking required the users to opt out, and failing to disclose how AI was monitoring, tracking, and utilizing these private communications. Normally, mobile device and Internet users such as Plaintiffs are able to affirmatively control the flow of sensitive information about themselves through "settings" and "permissions" that they grant, or withhold, from third parties, particularly private parties such as Google. Plaintiffs' and Class Members' expectations that those settings and permissions would be heeded and effective, and that they could send and receive communications privately without being tracked by Google, are eminently reasonable.

43. Plaintiffs and Class Members took specific steps to protect their private communications (as well as the private communications of their minor children) and had a reasonable expectation that Google would not use AI to monitor and track their private communications without their informed consent. Based on Google's representations and omissions, context, and industry norms, they expected Google to heed and follow their instructions and, as a result, expected that their private communications would be *private*, not tracked and utilized by Google's AI tool for Google's own benefit and to the detriment of their personal privacy. Those

[10] Douglas MacMillan and Robert McMillan, *Google Exposed User Data, Feared Repercussions of Disclosing to Public*, THE WALL STREET JOURNAL (Oct. 8, 2018), *available at* https://www.wsj.com/articles/google-exposed-user-data-feared-repercussions-of-disclosing-to-public-1539017194. Shortly thereafter, Google shut down the Google+ product entirely. Bill Chappell, *Google Accelerates Google+ Shutdown After 52.5 Million Users' Data Exposed*, NPR (Dec. 11, 2018), *available at* https://www.npr.org/2018/12/11/675529798/with-52-5-million-users-data-exposed-on-google-google-quickens-shutdown.

reasonable expectations were consistent with sentiments that are widely shared in American society and elsewhere, and grounded in long-standing social norms and jurisprudence protecting privacy.

44. Invasion of privacy has been recognized as a common law tort for more than a century. In *Griswold v. Connecticut*, 381 U.S. 479 (1965), the Supreme Court confirmed the primacy of privacy rights, explaining that the Constitution operates in the shadow of a "right of privacy older than the Bill of Rights." For its part, California amended its constitution in 1972 to specifically enumerate a right to privacy in its very first section. *See* Cal. Const. Art. I, § 1.

45. Google itself has long acknowledged the importance of user control over privacy settings. In 2018, Google's Chief Privacy Officer testified to United States Senate Committee on Commerce, Science, and Transportation that "users trust [Google] to keep their personal information confidential *and under their control*."[11]

46. According to a poll by the Pew Research Center, 93% of adults believe that being in control of who can get information about them is important, and 90% believe that controlling what information is collected about them is important.[12] Additionally, Americans say they do not approve of observation without consent: 88% say it is important that they not have someone watch or listen to them without their permission.[13]

47. According to a 2013 Pew Research study, "86% of Internet users have tried to be anonymous online and taken at least one step to try to mask their behavior or avoid being tracked."[14] For example, 64% percent of adults claim to clear their cookies and browser histories in an attempt to be less visible online.[15] Such behaviors exemplify people's expectation that their personal

---

[11] Written Testimony of Keith Enright Chief Privacy Officer, United States Senate Committee on Commerce, Science, and Transportation, *Examining Safeguards for Consumer Data Privacy*, (Sept. 26, 2018), *available at* https://nsarchive.gwu.edu/document/17926-keith-enright-chief-privacy-officer-google (emphasis added).

[12] Mary Madden and Lee Rainie, *Americans' Attitudes About Privacy, Security and Surveillance,* PEW RESEARCH CENTER (May 20, 2015), *available at* https://www.pewresearch.org/internet/2015/05/20/americans-attitudes-about-privacy-security-and-surveillance/.

[13] *Id.*

[14] Lee Rainie, et al., *Anonymity, Privacy, and Security Online*, PEW RESEARCH CENTER (Sept. 5, 2013) *available at* https://www.pewresearch.org/internet/2013/09/05/anonymity-privacy-and-security-online/.

[15] *Id.*

information will not be tracked by others without their consent or permission, and that settings claiming to allow them to protect such information will be effective.

48. A 2010 study comparing the opinions of young adults between the ages of 18 to 24 with other age categories (25-34, 35-44, 45-54, 55-64, and 65+) found that a large percentage of young adults were in harmony with older Americans regarding concerns about online privacy, norms, and policy suggestions.[16] For example, 88% of young adults surveyed responded that "there should be a law that requires websites and advertising companies to delete all stored information about an individual"; for individuals in the 45-54 age range, 94% approved of such a law.[17]

49. The same study noted that "[o]ne way to judge a person's concern about privacy laws is to ask about the penalties that companies or individuals should pay for breaching them." A majority of the 18- to 24-year-olds polled selected the highest dollar amount of punishment ("more than $2,500") in response to how a company should be fined if it purchases or uses someone's personal information illegally; across all age groups, 69% of individuals opted for the highest fine. Beyond a fine, approximately half of the sample (across all age groups) chose the harshest penalties for companies using a person's information illegally: putting them out of business and imposing jail time.[18]

50. Google claimed to offer people a choice when it came to data privacy. In purporting to offer users the ability to adjust data privacy settings to control whether Google's AI technology accesses their Gmail, Chat, and Meet accounts, Google warranted that it would respect those users' privacy choices. In reality, Google rendered users' choices meaningless when it surreptitiously turned on the "Smart features" setting for all Gmail, Chat, and Meet users without their knowledge or consent. Google's AI tracking of users' private communications was surreptitious and purposely deceptive, as they did not provide notification of this change, thus requiring users to discover this

---

[16] Chris Hoofnagle, et al., *How Different Are Young Adults from Older Adults When It Comes to Information Privacy Attitudes & Policies*, University of Pennsylvania Scholarly Commons (April 14, 2010), *available at* https://www.ftc.gov/sites/default/files/documents/public_comments/privacy-roundtables-comment-project-no.p095416-544506-00125/544506-00125.pdf.

[17] *Id.*

[18] *Id.*

change on their own and manually turn off the "Smart features" settings.

51. Not only were Google's representations about privacy likely to deceive people, Google did in fact deceive the millions of people who use Gmail, Chat, and Meet. Ordinary users, including Plaintiffs, reasonably expected that their Gmail, Chat, and Meet accounts would not be tracked and stored by AI unless they affirmatively turned on that feature in their Google accounts.

52. Google's misrepresentations continue, despite public reporting. Users are still being deceived and tracked without consent unless they are made aware of the change to their privacy settings and affirmatively turn off the "Smart features" settings, which are still worded in terms that deceptively suggest that something must be agreed to and turned on by the user, not by Google.

**D. Plaintiffs and Class Members Did Not Consent to Gemini AI's Intrusion.**

53. Plaintiffs and Class members did not receive an opportunity to consent or knowingly opt into the use of Gemini AI before Google surreptitiously enabled Gemini AI in their Google accounts.

54. Google's AI consent architecture and related privacy settings are designed to subvert and impair users' privacy choices. Section 1798.140 of the California Consumer Privacy Act ("CCPA") defines "dark patterns" as "a user interface designed or manipulated with the substantial effect of subverting or impairing user autonomy, decisionmaking, or choice." Cal. Civ. Code § 1798.140(l). Further, any "agreement obtained through use of dark patterns does not constitute consent." Cal. Civ. Code § 1798.140(h). Pursuant to the CCPA's implementing regulations, consumer consent interfaces must: (i) be symmetrical, in that the path to exercise greater privacy protection must not be longer or more difficult than the path to fewer protections; (ii) use clear and simple language, and "must not use double negatives, misleading statements or omissions" and "[t]oggles or buttons must clearly indicate the consumer's choice;" and (iii) the architecture must not impair consent by, for example, "bundling choices" so that the use of personal information is tied to consent to a separate service that does not require consent under the CCPA. 11 C.C.R. § 7004(a)(2), (3), and (4)(B).

55. The interface to opt-out of Smart features is neither symmetrical nor straightforward. No action is needed to turn the Smart features on because they are now enabled by

default. Conversely, to turn the features off, users must toggle Smart features off in two separate locations in their user settings (on the web, under "General settings" and "Google Workspace smart feature settings"). Even then, Smart features may still appear across Google products because certain products require separate disabling of the Smart features.

56. The Smart features opt-out language is unclear and misleading. As detailed above, the Smart features consent language indicates that "when you turn this setting on," but the toggle is already enabled.

57. Further, Google bundles intrusive AI features with basic non-AI functions such that opting out of Smart features results in eliminating unrelated basic email functions. For example, spell check is "currently tied to the Gemini opt-in."[19] Additionally, Gmail's tabbed inbox, which was fully enabled by default in July 2013, is also currently tied to Gemini AI and the Smart features. As a result, opting out of Gemini AI results in users' Gmail accounts returning to a pre-2013 layout.[20] Thus, Google has designed the privacy settings such that "turning off the AI features comes at the cost of other tools users may have become accustomed to."[21]

58. Google consistently fails to provide advanced notice of AI features that are enabled automatically for its users. This is by design. Google's users in the EU, UK, and Switzerland are not opted in by default. European privacy laws "require[] explicit opt-in consent, so Gemini is off by default and users must actively enable it."[22] However, users in the US are given no such opportunity to consider and consent.

59. The underhanded nature of Google's actions, including the dark patterns Google relies upon to subvert Plaintiffs' and Class Members' privacy choices, precludes Plaintiffs from

---

[19] Katherine Speller, *If You Use Gmail, You're Going To Want to Turn Off This 1 Automatic Setting ASAP*, HuffPost, Mar. 28, 2026, *available at* https://www.huffpost.com/entry/gmail-opt-out-gemini-goog_l_69c6a7eae4b0a6ee60c47 ed0.

[20] *Id.*

[21] *Gmail's new Gemini AI Features Can Be Turned Off, But There's a Catch*, WCNC Charlotte, Jan. 9, 2026, *available at* https://www.wcnc.com/article/news/nation-world/how-to-turn-off-gmail-ai-training-gemini-features-artificial-intelligence/507-5ba7947e-fc08-4602-8f5a-1f4fb017e8b0#:~:text=AI%20Overviews%2C%20which%20have%20appeared,act%20as%20a%20personalized%20briefing.

[22] Shelly Palmer, *Gmail's AI is On by Default*, ShellyPalmer.com, Jan. 9, 2026, *available at* https://shellypalmer.com/ 2026/01/gmails-ai-is-on-by-default/.

providing more detailed allegations absent discovery.

## VI. CLASS ALLEGATIONS

60. Plaintiffs bring this class action, pursuant to Rule 23 of the Federal Rules of Civil Procedure, individually and on behalf of all members of the following class, which is referred to throughout this Complaint as the "Class":

> All natural persons residing in the United States with Google accounts whose communications in Gmail, Chat, and/or Meet were accessed, reviewed, and/or analyzed by Google's Gemini AI after Google enabled Gemini AI in those persons' account settings without consent.

61. Excluded from each Class are the following individuals: officers and directors of Google and its parents, subsidiaries, affiliates, any entity in which Google has a controlling interest, and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

62. Plaintiffs reserve the right to modify or amend the Class definition before the Court determines whether certification is appropriate.

63. This action readily satisfies the requirements set forth under Federal Rule of Civil Procedure 23:

a. **Numerosity.** The Class is so numerous that joinder of all Members is impracticable. Upon information and belief, Class Members number in the millions.

b. **Predominance.** There are questions of law or fact common to the Class. These questions include, but are not limited to, the following:

i. Whether Google's acts and practices complained of herein amount to the use of "an electronic amplifying or recording device to eavesdrop upon or record" confidential communications in violation of CIPA;

ii. Whether Google's acts and practices complained of herein amount to "tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems" in violation of CDAFA;

iii. Whether Google's acts and practices complained of herein amount to "intentionally accesses without authorization a facility through which an electronic

communication service is provided" in violation of the SCA;

iv. Whether Google's acts and practices complained of herein amount to unlawful, unfair, and/or fraudulent practices in violation of the UCL;

v. Whether Google's acts and practices complained of herein amount to egregious breaches of social norms;

vi. Whether Google acted intentionally in violating Plaintiffs' and Class Members' privacy rights;

vii. Whether an injunction should issue; and

viii. Whether declaratory relief should be granted.

c. **Typicality.** Plaintiffs' claims are typical of the claims of the Class. Plaintiffs and Class Members maintained private, password-protected Gmail, Chat, and/or Meet accounts that they thought were secure and not being tracked by Google. Despite these efforts and contrary to Google's representations, Plaintiffs and Class Members nonetheless had their Gmail, Chat, and/or Meet accounts tracked by Google's AI technology. Plaintiffs and Class Members did not consent to Google's tracking of their private communications, which forms the basis for this suit.

d. Moreover, like all Class Members, Plaintiffs continue to suffer a substantial risk of repeated injury in the future. First, data already accessed by Gemini AI may be used for Google's vast advertising scheme and to train Google's AI in perpetuity, and may also be exposed to hackers. Second, Plaintiffs continue to use and rely upon the Gmail, Chat, and/or Meet services that are capable of being tracked by Google's Gemini AI, and Google may unilaterally change these privacy settings again in the future. Google has shown deliberate indifference to Plaintiffs' and Class Members' desire to keep their communications private, and has indeed taken pains to deceive and mislead Plaintiffs and Class Members and to conduct its business contrary to their privacy rights, and contrary to the plain meaning of its own terms of service in favor of surreptitiously and deceitfully monitoring their private communications. Google's deceptive and deliberate actions have thwarted and continue to threaten Plaintiffs' and Class Members' ability to exercise control over their own privacy while using their Gmail, Chat, and Meet accounts. Because the conduct complained of herein is systemic, Plaintiffs and Class Members face substantial risk of the same

injury in the future. Google's conduct is common to all Class Members and represents a common pattern of conduct resulting in injury to all Class Members. Plaintiffs have suffered the harm alleged and have no interests antagonistic to any other Class Member.

e. **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs' interests do not conflict with the interests of the Class Members. Furthermore, Plaintiffs have retained competent counsel experienced in class action litigation, consumer protection litigation, and electronic privacy litigation. Plaintiffs' counsel will fairly and adequately protect and represent the interests of the Class. Federal Rule of Civil Procedure 23(a)(4) and 23(g) are satisfied.

f. **Superiority.** In acting as alleged above, and in failing and refusing to cease and desist despite being exposed, Google has acted on grounds generally applicable to the entire Class, thereby making final injunctive relief and corresponding declaratory relief each appropriate with respect to the Class as a whole. The prosecution of separate actions by individual Class Members would create the risk of inconsistent or varying adjudications with respect to individual Class Members that would establish incompatible standards of conduct for Google.

g. **Injunctive and Declaratory Relief.** Injunctive relief is necessary to put an end to Google's continued use of the communications and data it has already surreptitiously accessed and collected, as well as the communications and data it continues to surreptitiously access and collect. Google must be required to permanently delete all data such that the data cannot be used for any purpose, including for training AI in its current Gemini form or any future form and any data linked to user accounts or collected for advertising or any other purpose. Further, injunctive relief is necessary to halt Google's ongoing unfair and unlawful use of dark patterns that subvert and contradict users' privacy choices. As long as these practices are allowed to continue, Plaintiffs and Class Members face an ongoing risk that Google will continue to surreptitiously grant AI access to their Google accounts. Plaintiffs and Class Members cannot eliminate this risk of future harm simply by disabling the Smart features because (1) certain private information has already been exposed and must be deleted; and (2) Google already appears poised to deploy the same dark patterns in other settings as Google recently announced that Gemini AI will be directly

embedded into the Android operating system such that "most" but not all of Gemini's "features will be opt-in."[23] Accordingly, money damages, alone, could not afford adequate and complete relief, and injunctive relief is necessary to restrain Google from continuing to commit its illegal and unfair violations of privacy.

## VII. CAUSES OF ACTION

### Count One
### (Violations of CIPA, Cal. Penal Code §§ 630 *et seq.*)

64. Plaintiffs repeat and reallege the preceding allegations in paragraphs 1–63 as if contained herein.

65. Cal. Pen. Code § 630 provides that "[t]he Legislature hereby declares that advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communication and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society."

66. Google's acts and practices complained of herein, engaged in for purposes of tracking and storing indefinitely the private communications of its users without their consent—and indeed in direct contravention of Google's own wording of the "Smart features" setting that suggests it must be turned on to "opt in," when, in reality, Google has already secretly turned it on and requires users to find the setting and turn it off to "opt out"—violated and continues to violate Cal. Pen. Code § 632.

67. Cal. Pen. Code § 632 prohibits the use of "an electronic amplifying or recording device to eavesdrop upon or record [a] confidential communication, whether the communication is carried on among the parties in the presence of one another or by means of a telegraph, telephone, or other device . . . ."

68. In direct violation of this prohibition and without the consent of Plaintiffs or Class Members, Google has been using its Gemini AI technology to eavesdrop and record the confidential

[23] Asad Kashif, *Gemini Wants to Take Over Your Android Phone*, Yahoo! Tech (June 4, 2026), *available at* https://tech.yahoo.com/ai/gemini/articles/gemini-wants-over-android-phone-164700176.html.

communications of Plaintiffs and Class Members on their Gmail, Chat, and Meet accounts.

69. Google accessed or caused to be accessed Plaintiffs' and Class Members' private communications from California. On information and belief, Google uses servers located in California that allow Google to access private communications of Plaintiffs and Class Members. Google's terms of service indicate that California law controls the use of its services.

70. As a result of Google's violations of Cal. Pen. Code § 632, Plaintiffs and Class Members are entitled to the following relief:

a. A declaration that Google's conduct violates CIPA;

b. Statutory damages and/or trebled actual damages;

c. Injunctive relief in the form of, *inter alia*, an order enjoining Google from continuing to access Plaintiffs' and Class Members' private communications in violation of CIPA;

d. Injunctive relief in the form of, *inter alia*, an order requiring Google to destroy all data created or otherwise obtained from its illegal tracking of Plaintiffs' and Class Members' private communications; and

e. An award of attorney's fees and costs of litigation as provided by CIPA, the private attorney general doctrine existing at common law and also codified at California Civil Code Section 1021.5, and all other applicable laws.

**<u>Count Two</u>**
**(Intrusion Upon Seclusion)**

71. Plaintiffs repeat and reallege the preceding allegations in paragraphs 1–63 as if contained herein.

72. Plaintiffs and Class Members have reasonable expectations of privacy in their Gmail, Chat, and Meet accounts. Plaintiffs' and Class Members' private affairs include communications contained in these accounts.

73. The reasonableness of such expectations of privacy is supported by Google's unique position to monitor Plaintiffs' and Class Members' private communications through its access to Plaintiffs' and Class Members' Gmail, Chat, and Meet accounts. It is further supported by the surreptitious nature of Google's tracking.

74. Google intentionally intruded on and into Plaintiffs' and Class Members' solitude, seclusion, or private affairs by intentionally using AI to track their private communications.

75. These intrusions are highly offensive to a reasonable person. The communications sent and received through Gmail, Chat, and Meet are reasonably considered private information and are thus password protected, encrypted, and/or protected via two-factor authorization. Moreover, Google engaged in AI tracking deceptively and without the informed consent of Plaintiffs and Class Members. Also supporting the highly offensive nature of Google's conduct is the fact that Google surreptitiously turned on this AI tracking "feature" without informing or obtaining the consent of Plaintiffs and Class Members.

76. Plaintiffs and Class Members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

77. Google's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class Members.

78. As a result of Google's actions, Plaintiffs and Class Members seek damages and punitive damages in an amount to be determined at trial. Plaintiffs and Class Members seek punitive damages because Google's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class Members and made in conscious disregard of Plaintiffs' and Class Members' privacy rights. Punitive damages are warranted to deter Google from engaging in future misconduct.

## **Count Three**
## **(California Constitutional Right to Privacy, Cal. Const. Art. I, § 1)**

79. Plaintiffs repeat and reallege the preceding allegations in paragraphs 1–63 as if contained herein.

80. Plaintiffs and Class Members have reasonable expectations of privacy in their Gmail, Chat, and Meet accounts. Plaintiffs' and Class Members' private affairs include communications contained in these accounts.

81. Google intentionally intruded on and into Plaintiffs' and Class Members' solitude, seclusion, right of privacy, or private affairs by intentionally tracking the private communications.

82. These intrusions are highly offensive to a reasonable person. The communications sent and received through Gmail, Chat, and Meet are reasonably considered private information and are thus password protected, encrypted, and/or protected via two-factor authorization. Moreover, Google engaged in AI tracking deceptively and without the informed consent of Plaintiffs and Class Members. Also supporting the highly offensive nature of Google's conduct is the fact that Google surreptitiously turned on this AI tracking "feature" without informing or obtaining the consent of Plaintiffs and Class Members.

83. Plaintiffs and Class Members were harmed by the intrusion into their private affairs as detailed throughout this complaint.

84. Google's actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class Members.

85. As a result of Google's actions, Plaintiffs and Class Members seek damages and punitive damages in an amount to be determined at trial. Plaintiffs and Class Members seek punitive damages because Google's actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class Members and made in conscious disregard of Plaintiffs' and Class Members' privacy rights. Punitive damages are warranted to deter Google from engaging in future misconduct.

**Count Four**
**(Violations of CDAFA, Cal. Penal Code § 502)**

86. Plaintiffs repeat and reallege the preceding allegations in paragraphs 1–63 as if contained herein.

87. The California legislature enacted CDAFA with the intent of "expand[ing] the degree of protection afforded to individuals . . . from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code §502(a). The enactment of CDAFA was motivated by the finding that "the proliferation of computer technology has resulted in a concomitant proliferation of . . . unauthorized access to computers, computer systems, and computer data." *Id.*

88. Plaintiffs' and Class Members' computing devices used to access their Gmail, Chat,

and Meet accounts constitute "computers" within the scope of CDAFA.

89. Google violated the following sections of CDAFA:

a. Section 502(c)(1), which makes it unlawful to "knowingly access[] and without permission . . . use[] any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data;"

b. Section 502(c)(2), which makes it unlawful to "knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network;" and

c. Section 502(c)(7), which makes it unlawful to "knowingly and without permission accesses or causes to be accessed any computer, computer system, or computer network."

90. Google knowingly accessed Plaintiffs' and Class Members' Gmail, Chat, and Meet accounts without their permission by surreptitiously activating Gemini AI access that intercepts and transmits data, communications, and personal information concerning Plaintiffs and Class Members.

91. Google used data, communications, and personal information that it intercepted and took from Plaintiffs' and Class Members' Gmail, Chat, and Meet accounts to wrongfully and unjustly enrich itself at the expense of Plaintiffs and Class Members.

92. Google took, copied, intercepted, and made use of data, communications, and personal information from Plaintiffs' and Class Members' Gmail, Chat, and Meet accounts.

93. Google knowingly and without Plaintiffs' and Class Members' permission accessed or caused to be accessed their Gmail, Chat, and Meet accounts by installing—without Plaintiffs' and Class Members' informed consent—AI software that intercepts and/or takes data, communications, and personal information concerning Plaintiffs and Class Members.

94. Google accessed or caused to be accessed Plaintiffs' and Class Members' data, communications, and personal information from California. On information and belief, Google

uses servers located in California that allow Google to access and process the data, communications, and personal information concerning Plaintiffs and Class Members. Google's terms of service indicate that California law controls the use of its services.

95. Google was unjustly enriched by intercepting, acquiring, taking, or using Plaintiffs' and Class Members' data, communications, and personal information without their permission, and using it for Google's own financial benefit. Google has been unjustly enriched in an amount to be determined at trial.

96. As a direct and proximate result of Google's violations of CDAFA, Plaintiffs and Class Members suffered damages.

97. Pursuant to CDAFA Section 502(e)(1), Plaintiffs and Class Members seek compensatory, injunctive, and equitable relief in an amount to be determined at trial.

98. Pursuant to CDAFA Section 502(e)(2), Plaintiffs and Class Members seek an award of reasonable attorney's fees and costs.

99. Pursuant to CDAFA Section 502(e)(4), Plaintiffs and Class Members seek punitive or exemplary damages for Google's willful violations of CDAFA.

**Count Five**
**(Violations of the SCA, 18 U.S.C. §§ 2701 *et seq.*)**

100. Plaintiffs repeat and reallege the preceding allegations in paragraphs 1–63 as if contained herein.

101. The SCA provides: "a person or entity providing remote computing service to the public shall not knowingly divulge to any person or entity the contents of any communication which is carried or maintained on that service." 18 U.S.C. § 2702(a)(2).

102. The SCA defines an "electronic communications service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

103. Google intentionally and knowingly divulged the contents of Plaintiffs' and Class Members' communications carried or maintained on Google's services when Google used its Gemini AI technology to access Plaintiffs' and Class Members' Gmail, Chat, and Meet accounts

for purposes of tracking their private communications.

104. The Gmail, Chat, and Meet services utilized by Plaintiffs and Class Members on their computing devices provide electronic communications services to Plaintiffs and Class Members because they "provide to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

105. Neither Plaintiffs and Class Members nor the third parties with whom they communicated on Gmail, Chat, and Meet authorized the extent of Google's access to Plaintiffs' and Class Members' communications.

106. Plaintiffs' and Class Members' Gmail, Chat, and Meet accounts—and the computing devices, applications, and/or web browsers through which they accessed those services—also are facilities under the SCA because they comprise the software necessary for and "through which (the) electronic communications service is provided."

107. Google intentionally accessed and divulged Plaintiffs' and Class Members' Gmail, Chat, and Meet accounts without authorization when Google enabled Gemini AI to access the communications on those services without obtaining the consent of the Plaintiffs and Class Members.

108. Upon information and belief, Google's acquisition and divulgence of electronic communications from Plaintiffs and Class Members included private communications Plaintiffs and Class Members had with third parties that are not affiliated with Google.

109. Plaintiffs and Class Members were harmed by Google's violations and, pursuant to 18 U.S.C. § 2707(c), are entitled to statutory damages or actual damages, including profits earned by Google attributable to the violations, punitive damages, costs, and reasonable attorney's fees.

## **Count Six**
## **(Violations of the UCL, Cal. Bus. & Prof. Code §§ 17200 *et seq.*)**

110. Plaintiffs repeat and reallege the preceding allegations in paragraphs 1–63 as if contained herein.

111. Google's conduct constitutes unfair, illegal, and fraudulent business practices within the meaning of the UCL.

112. Google's conduct violated certain laws as alleged herein, including CIPA, CDAFA, SCA, CCPA (*see* Cal. Civ. Code § 1798.140), and California's Constitutional Right to Privacy. By engaging in the said conduct in the course of doing business within California, Google engaged in unlawful business practices in violation of the UCL as to Plaintiffs and Class Members.

113. By engaging in the above-described conduct in the course of doing business, Google engaged in unfair business practices in violation of the UCL because the harm to Plaintiffs' and Class Members' private, personal information outweighed any utility that Google conduct may have produced.

114. Google's failure to provide adequate notice to Plaintiffs and Class Members regarding its activation of the Gemini "Smart features" constitutes a fraudulent act or practice in violation of the UCL. Google's surreptitious application of this AI technology to access and view Plaintiffs' and Class Members' private Gmail, Chat, and/or Meet communications constitutes a fraudulent act or practice in violation of the UCL.

115. On information and belief, Google's conduct emanated from California and it uses servers located in California that allow Google to access and process the data, communications, and personal information concerning Plaintiffs and Class Members. Google's terms of service indicate that California law controls the use of its services.

116. Plaintiffs and Class Members suffered injury in fact as a result of Google's conduct.

117. Individually and on behalf of the Class, Plaintiffs seek injunctive relief, restitution, and all other damages available under this cause of action.

## VIII. <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs request that judgment be entered against Google and that the Court grant the following:

A. An order determining that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiffs are proper class representatives, that Plaintiffs' attorneys shall be appointed as Class counsel pursuant to Rule 23(g) of the Federal Rules of Civil Procedure, and that Class notice be promptly issued;

B. Judgment against Google for Plaintiffs' and Class Members' asserted causes of

action;

C. Appropriate declaratory relief against Google;

D. Injunctive relief in the form of, *inter alia*, an order enjoining Google from continuing its practice of accessing, using, and/or storing Plaintiffs' and Class Members' private communications without their knowledge or consent in violation of the CIPA, CDAFA, SCA, and/or UCL;

E. Injunctive relief in the form of, *inter alia*, an order enjoining Google from continuing its practice of tracking, recording, and using Plaintiffs' and Class Members' private communications, and to cease using and permanently the data it unlawfully obtained from those private communications;

F. An order awarding Plaintiffs and the Class Members damages, special damages, general damages, and restitution;

G. An order requiring Google to pay punitive damages and exemplary damages;

H. An order requiring Google to pay pre-judgment and post-judgment interest;

I. Reasonable attorney's fees and costs reasonably incurred; and

J. Any and all other and further relief to which Plaintiffs and the Class may be entitled.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of all issues so triable.

Respectfully Submitted,

Dated: August 18, 2026

*/s/ Tina Wolfson*

Tina Wolfson (SBN 174806)
twolfson@ahdootwolfson.com
Robert Ahdoot (SBN 172098)
rahdoot@ahdootwolfson.com
Theodore W. Maya (SBN 223242)
tmaya@ahdootwolfson.com
Lisa M. Cintron (SBN 356009)
lcintron@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505-4521
Telephone: 310.474.9111
Facsimile: 310.474.8585

Bradley K. King (SBN 274399)
bking@ahdootwolfson.com
**AHDOOT & WOLFSON, PC**
521 Fifth Avenue, 17th Floor
New York, NY 10175
Telephone: 917.336.0171
Facsimile: 917.336.0177

*Counsel for Plaintiffs and the Proposed Class*